UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff, CASE NO. 11-CR-20564

v. HON. MARK A. GOLDSMITH

D-8 DENNIS TATE,

Defendant.
_________________________________/

**UNITED STATES' RESPONSE OPPOSING BOTH DEFENDANT'S REQUEST FOR HOME CONFINEMENT AND DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Dennis Tate was part of a large drug trafficking conspiracy. The conspiracy spanned across several states, including California, Georgia, Ohio, Pennsylvania and Michigan. The conspiracy primarily involved cocaine and also some marijuana. Tate sold seven kilograms of cocaine during the conspiracy.

Tate pleaded guilty to Conspiracy to Distribute and to Possess With Intent to Distribute 5 Kilograms or more of Cocaine, in violation of 21 U.S.C. 846 and 841(b)(1)(A), in January 2013. He was on probation during the conspiracy. Pre-Sentence Report (PSR) at pars 94 – 96. While on bond in this case, he was arrested for and convicted of drunk driving. *Id*. Tate twice tested positive for drug use

while on bond; once for opioids and once for cocaine. PSR at pars 4-5, 94-96. Tate was thrown out of an inpatient drug treatment program for his altercation with another patient. *Id*. He was disciplined while in prison (Exhibit 6, sealed).

This was not Tate's first felony drug conviction; he has one prior such conviction. He also has three misdemeanor convictions —including one for assault and battery.

On February 27, 2014, Tate was sentenced to 120 months' custody and 5 years' supervised release. Tate's current projected release date is December 2, 2021. He now moves for home detention/early release, which the government also construes as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

*First*, since January 2020, the Bureau of Prisons has been preparing for Covid-19, implementing strict precautions to minimize the virus's spread in its facilities. Following two recent directives from the Attorney General, the Bureau of Prisons is also assessing its entire prison population to determine which inmates face the most risk from Covid-19, pose the least danger to public safety, and can safely be granted home confinement. This process necessarily requires the Bureau of Prisons to identify the best candidates for release, ensure that their homes are suitable for home confinement, and arrange a way to quarantine each of them for 14 days. As of May 18, 2020, these directives have already resulted in at least

2,783 inmates being placed on home confinement. *See* BOP Covid-19 Website.

*Second*, although Tate exhausted his administrative remedies, Tate does not satisfy the statutorily mandated criteria for compassionate release. This counsels against Tate's motion.

Tate did submit a request for compassionate relief on the basis of health issues, including Covid-19. See Exhibit 1, dated March 31, 2020. The Warden signed his denial of Tate's request on April 29, 2020 (Exhibit 2). Although Tate does not appear to have continued to pursue any administrative appeals beyond the Warden's denial, more than 30 days have passed since the date of Tate's initial request. Thus, the government will consider Tate to have exhausted his administrative remedies.

But that does not end the inquiry. Because § 3582(c)(1)(A) requires that release be "consistent with" the Sentencing Commission's policy statements, Tate's failure to meet the criteria in USSG § 1B1.13 alone forecloses relief. Even when Covid-19 is taken into account, Tate's age (45) and health concerns do not satisfy the requirements in § 1B1.13(1)(A) & cmt. n.1. Further, although Tate tested positive for covid-19 on May 23, 2020, his medical records reflect that his condition appears to be well-managed. *See* Exhibits 3 (2019 medical records) and 4 (2020 medical records) (Sealed). Indeed, as recently as June 1, 2020, Tate is not running a fever and his lungs are clear. He does not exhibit troubling symptoms.

Moreover, even if Tate were able to articulate extraordinary or compelling reasons to warrant compassionate release, his offense conduct, failure to abide by the terms of his prior probation and his bond in this case, and his past convictions make him a danger to the community, *see* USSG § 1B1.13(2), which is itself sufficient to bar his eligibility for relief. Given Tate's dangerousness, the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release. For all these reasons, the Court should deny Tate's motion.

## Background

Tate was overheard on court-authorized telephone interceptions negotiating and dealing seven kilograms of cocaine with one of the lead defendants in this case. Defendant pleaded guilty on January 17, 2013 to the drug conspiracy (cocaine, over 5 kilograms). Following his guilty plea, the court sentenced Tate to 120 months' imprisonment to be followed by 5 years of supervised release.

Tate is currently incarcerated at Milan Federal Correctional Institution. As of June 1, 2020, FCI Milan has had 73 inmates who tested positive for Covid-19. Four are pending recovery. All but three of the rest have recovered.

Tate is 45 years old, and his projected release date is December 2, 2021. He has tested positive for covid-19, but according to his 2019 and 2020 medical records from BOP (Exhs. 3 & 4), he is not showing symptoms – his lungs are clear

and he has no fever. Moreover, nothing in his medical records suggests that his health is debilitating, and he has no other notable conditions aside from high blood pressure, which appears well managed. *Id.* Put differently, none of his medical conditions put him in a high-risk category. And with respect to Covid-19, he may have already recovered and appears asymptomatic.

Nevertheless, Tate has moved for early/compassionate release, citing his positive test for Covid-19 and other alleged infirmities, including a prior diagnosis of latent tuberculosis (treated and resolved in 2015) and an unsubstantiated claim of "possible pneumonia".[1] For the reasons set forth below, the Court should deny Tate's motion.

## I. The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.

### A. The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within its facilities. For over almost a decade, the Bureau of Prisons has maintained a detailed protocol for responding to a pandemic. Consistent with that protocol, the Bureau of Prisons began planning for Covid-19 in January 2020.

[1] Likewise, although Tate's underlying request to the Warden also claims he suffers from "prostate cancer", this is not raised in his motion to this Court, nor is it substantiated by his BOP medical record. Rather, in 2016, it appears Tate was diagnosed with benign prostatic hyperplasia (BPH), a non-cancerous enlargement of the prostate gland, for which he is currently prescribed medication.

On March 13, 2020, the Bureau of Prisons began modifying its operations to implement its Covid-19 Action Plan and minimize the risk of Covid-19 transmission into and inside its facilities. *See* BOP Covid-19 Modified Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of Prisons has repeatedly revised its plan. The current plan, which is in effect until June 30, 2020, requires that inmates in every institution be secured in their assigned cells or quarters for at least 14 days to stop the spread of the disease. Only limited group gathering is allowed, and social distancing is maximized. Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. And the movement of inmates and detainees between facilities is severely restricted, with exceptions only for medical treatment and similar exigencies.

Every newly admitted inmate is screened for Covid-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are provided with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. In areas with sustained community transmission, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with

other symptoms can be placed on leave by a medical officer.

Other access to the facilities has likewise been restricted. Contractors are only permitted access if performing essential services, and any contractor who requires access is screened for symptoms and risk factors. Social and legal visits have been suspended in order to limit the number of people entering the facility and interacting with inmates. But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. New legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during

the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 2,783 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Attorney General's directives have explained, these home-confinement decisions have required evaluating several criteria:

1.) Each inmate's age and vulnerability to Covid-19;

2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and

3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP).

These criteria not only make sense, but also fit the realities of the Covid-19 pandemic far better than any other solution does. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). The Bureau of Prisons' home-confinement initiative thus appropriately focuses on the inmates who will most benefit from release and whose release is least risky.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation

department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at *6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II. The Court should deny Tate's motion for compassionate release.

Tate's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Quite the contrary: a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once

it has been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow. *United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, even where a defendant exhausts his administrative remedies, he must also show "extraordinary and compelling reasons" for compassionate release, § 3582(c)(1)(A), and release must be "consistent with" the Sentencing Commission's policy statements. As with the identical language in § 3582(c)(2), compliance with the policy statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). To qualify, a defendant must have a medical condition, age-related issue, family circumstance, or other reason that satisfies the criteria in USSG § 1B1.13(1)(A) & cmt. n.1, *and* he must "not [be] a danger to the safety of any other person or to the community," USSG § 1B1.13(2). Tate is ineligible for relief as he has both (1) failed to offer any "extraordinary and compelling reasons" and (2) remains a danger to the community.

*Second*, even if a defendant is eligible for compassionate release, the district court may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release. 18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require the district court to consider the defendant's history and characteristics, the seriousness of the offense, the need to promote respect for the

law and provide just punishment for the offense, general and specific deterrence, and the protection of the public. 18 U.S.C. § 3553(a). Tate's personal characteristics and prior criminal conduct pose too great a risk to the community; he is ill-suited for compassionate release.

**A. There are no extraordinary and compelling reasons to grant Tate compassionate release.**

Tate's motion should be denied because it lacks the required extraordinary and compelling reasons necessary under the law. Compassionate release must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress tasked the Sentencing Commission with "describe[ing] what should be considered extraordinary and compelling reasons for [a] sentence reduction" under § 3582(c)(1)(A), as well developing "the criteria to be applied and a list of specific examples" for when release is permitted. 28 U.S.C. § 994(t).

Because the Sentencing Commission has fulfilled Congress's directive in USSG § 1B1.13, that policy statement is mandatory. Section 3582(c)(1)(A)'s reliance on the Sentencing Commission's policy statements mirrors the language governing sentence reductions under 18 U.S.C. § 3582(c)(2) for retroactive guideline amendments. *Compare* § 3582(c)(1)(A) *with* § 3582(c)(2). When Congress uses the same language in the same statute, it must be interpreted in the same way. *Marshall*, 954 F.3d at 830. In both contexts, then, the Sentencing

Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014); *accord Dillon v. United States*, 560 U.S. 817, 830 (2010).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *2–*3 (10th Cir. Mar. 26, 2020); *United States v. Mollica*, No. 2:14-CR-329, 2020 WL 1914956, at *4 (N.D. Ala. Apr. 20, 2020). Section 1B1.13 remains binding.

Section 1B1.13 cabins compassionate release to a narrow group of defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1. As the Tenth Circuit recently explained, a district court "lack[s] jurisdiction" to grant compassionate release when a defendant's circumstances do not fall within those categories. *Saldana*, 2020 WL 1486892, at *3.

Tate's circumstances do not fall within any of these categories. His medical records indicate that he is asymptomatic despite testing positive for Covid-19.

Since his diagnosis on May 23, 2020, BOP doctors have evaluated Tate daily. Tate is not running a fever. His blood pressure remains within his personal range. His lungs are clear; he is not congested. According to the Centers for Disease Control, re-infection with Covid-19 is unlikely, and Tate's current medical status suggests that the potentially severe consequences faced by some individuals with ovid-19 failed to manifest in his case, undercutting his entire argument for release. *See, e.g.*, *U.S. v. Bland*, Case No. 2:18-cr-20555 at p. 3, n. 3 (Goldsmith, J.)(Attached as Exhibit 5).

Tate is receiving treatment at his institution for his occasional headaches and other routine ailments. Moreover, he is not elderly; Tate is only 45 years old. He states in his motion that his "only adequate relief…is his release from confinement" and that he "cannot seek medical treatment while in custody of the Bureau of Prisons." Defendant's brief at p.13; PgID 4440. This is simply inaccurate. Tate does not show symptoms of any serious ailment. And he has had ample, free and available health care, as his attached records demonstrate. Tate's situation is hardly extraordinary or compelling under the Guidelines. See USSG § 1B1.13 cmt. n.1.

Nor does the Covid-19 pandemic by itself qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of Covid-19 in society and the possibility that it may spread to

a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Tate and other inmates. Nothing in the statute or USSG § 1B1.13 supports the unbounded interpretation of § 3582(c)(1)(A) that he now asks this Court to adopt. *See Raia*, 954 F.3d at 597. Moreover, Tate's risk of re-infection of Covid-19 is low. *See Bland*, *supra*.

Tate is also ineligible for compassionate release for another reason: he remains a danger to the community. Section 1B1.13(2) only permits release if a defendant is "not a danger to the safety of any other person or to the community." But Tate's current and prior drug convictions show that he clearly remains a danger to the community. Tate engaged in controlled transactions involving significant quantities of drugs, and the Sixth Circuit has routinely affirmed findings of dangerousness for "run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947 (6th Cir. 2010). But Tate's danger to the community is compounded by his prior assault conviction and his choice to not abide by the conditions of his prior supervision – including in the instant case. Further, the government's belief in Tate's dangerousness is reinforced by his in-custody disciplines for possessing a

hazardous tool. (*See* Exhibit 6)(sealed). This factor, too, forecloses relief here.

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Some cities, including Detroit, have seen spikes in shootings and murders. Child sex predators have taken advantage of bored school-aged kids spending more time online. Covid-19-based fraud schemes have proliferated. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Because Tate's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under 18 U.S.C. § 3582(c)(1)(A).

**B. The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.**

Even when an inmate is statutorily eligible for a sentence modification based on "extraordinary and compelling reasons," compassionate release is not necessarily appropriate. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine whether those factors support release. *See United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not

warrant compassionate release . . . under 18 U.S.C. § 3553(a)”); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *6 (E.D. Mich. May 15, 2020) (denying compassionate release because “the 18 U.S.C. § 3553(a) sentencing factors do not favor release”); *see also United States v. Kincaid*, 802 F. App’x 187, 188–89 (6th Cir. 2020) (upholding a district court’s denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Tate eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Here, Tate sold 7 kilograms of cocaine over several transactions. He was working with the top tier of decision makers in the conspiracy. He has previous convictions for drugs, assault and battery, and drunk driving.

Tate’s drug activity is hazardous to the community. Drug trafficking itself, “even without any indication that the defendant has engaged in violence,” poses a danger to the community. *See Stone* at 947, n.6; *accord*, *United States v. Hinton*, 113 F. App’x 76 (6th Cir. 2003)(cocaine conspiracy). The Sixth Circuit is not alone in this view. The Fifth Circuit has, in the context of discussing bond, stated that the “risk of continued narcotics trafficking on bail constitutes a risk to the community.” *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989). The Second Circuit likewise has stated that it is “clear that the harm to society caused by narcotics trafficking is encompassed within Congress’ definition of ‘danger.’” *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985).

Tate's conduct while on supervision further adds to the concern about his dangerousness. He committed the drug conspiracy while he was on probation. Tate committed drunk driving while on bond in this case. Bond was no deterrence for Tate's continuing drug use. He tested positive for opiate use. Two months later, he tested positive for cocaine use. Even while in prison, Tate chose to violate the rules. He was disciplined for possessing a cell phone. *See* Exhibit 6.

The Court imposed a sentence of 120 months' incarceration after having considered the relevant 3553(a) factors; nothing significant about that analysis has changed. Tate remains a danger to the community. For all these reasons, this court should deny defendant's motion.

## III. If the Court were to grant Tate's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Tate's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release. This is especially important here, where Tate has already tested positive for Covid-19.

## Conclusion

Tate's motion should be denied.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

s/ *David J. Portelli*
DAVID J. PORTELLI
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9711
dave.portelli@usdoj.gov
P40688

Date: June 2, 2020

CERTIFICATE OF SERVICE

I hereby certify that on Tuesday, June 02, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Stefanie Lynn Junttila
Law Office of Stefanie L. Lambert PLLC
500 Griswold Street, Ste. 2340
Detroit, MI 48301

s/ *David J. Portelli*
DAVID J. PORTELLI
Assistant U.S. Attorney